IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RAMON RIVERA VELEZ, in his personal capacity and ad member of the Conjugal partnership comprised between him and his wife FRALIA RIVERA DIAZ,

Plaintiffs

v.

UNIVERSAL INSURANCE COMPANY, EASTERN AMERICAN INSURANCE COMPANY, ELIZABETH BERRIOS & AILEEN ROSADO,

Defendants.

CIVIL NO. 11-2260 (CVR)

## OPINION AND ORDER

### INTRODUCTION

Before the Court is Defendants' Universal Insurance Company and Eastern American Insurance Company ("Defendants") Motion for Summary Judgment (Docket No. 50), Plaintiff Ramón Rivera's ("Plaintiff" or "Rivera") Opposition thereto (Docket No. 80), Defendants' Reply thereto (Docket No. 95), and Plaintiff's Sur-Reply thereto (Docket No. 102).

On December 28, 2011, Plaintiff Rivera filed a complaint against Defendants, alleging disability discrimination and retaliation for engaging in protected activity, in violation of the American with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*, ("ADA"), as amended. Plaintiff additionally invoked the Court's supplemental jurisdiction for his state law disability discrimination and constructive dismissal claims pursuant to Act No. 44 of July 2, 1985, and Act No. 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §185a, *et seq*. Plaintiff alleged that he was a qualified and disabled individual as construed by the ADA and that as

a result thereof, he requested various reasonable accommodations of his employer, which were denied and/or granted in a belated manner.  Initially, Mrs. Fralia Rivera, Plaintiff's spouse, was included as a named party, but a careful review of the Complaint and its allegations revealed that the only real plaintiff in this case was Ramón Rivera-Vélez in his personal capacity and as a member of the Conjugal Partnership, and that no claims were alleged on behalf of Mrs. Rivera.  See, Docket No. 43.

For the reasons stated below, and upon careful consideration of the parties' submissions and applicable law, the Court GRANTS Defendants' Motion for Summary Judgment.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts", and that he is "entitled to judgment as a matter of law."  Vega-Rodríguez v.  Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st  Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v.  Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997).  A fact is deemed "material" if it potentially could affect the outcome of the suit.  Id.  Moreover, there will only be a

"genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id.

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v.  Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).  There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v.  Puerto Rico Mar.  Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).  In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Cadle Co.  v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also, Colón v. Infotech Aerospace Services, Inc., 869 F.Supp.2d 220, 225-226 (D. Puerto Rico 2012).  Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.' " Hernández, 869 F.Supp.2d at 7 (quoting Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)).  Local Rule 56 imposes guidelines for both the movant and  the  party  opposing  summary  judgment.   A  party  moving  for  summary

judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56©.   If they so wish, they may submit a separate statement of facts which they believe are in controversy.   Facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226.  Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril." Hernández, 486 F.3d at 7.

## FINDINGS OF FACT

At the outset, the Court notes that Plaintiff's opposition to Defendants' Statement of Uncontested Material Facts is procedurally non-compliant with the Local Rules.  As previously mentioned, Loc. R. Civ. P. 56(c) specifically requires that the respondent either admit, deny, or qualify each of movant's proffered uncontested facts,  and for each denied or qualified statement, the non-movant must cite the specific part of the record which supports its denial or qualification.  The non-moving party, if it so wishes, can prepare a separate statement of issues of material fact which it deems are in controversy, and which preclude the entry of summary judgment.  See Loc. R. Civ. P. 56 (c). Insofar as Plaintiff failed to include a separate statement of contested facts, and instead opted to lump his new facts together with his opposition, the opposition is non-compliant. See, Cosme-Rosado v.

Serrano-Rodríguez, 360 F.3d 42, 46 (1st Cir. 2004) ("uncontested" facts pleaded by movant deemed admitted due to respondent's failure to properly submit statement of contested facts.")

As a second procedural matter, many of Plaintiff's denials are also non-compliant, insofar as they do not oppose the truth of the statement offered.  A review of Plaintiffs' qualifications of Defendants' fact statements shows that they are either irrelevant to the matter at hand, or consist of mere "speculation, generalities, conclusory assertions, improbable inferences, and, for lack of a better phrase, a lot of 'hot air.' " Eli Lilly and Co., 958 F.Supp. 721, 728 (D. Puerto Rico 1997).  As a result of this procedural mishap by Plaintiff, unless otherwise stated, the Court deems admitted most facts from Defendants' Statement of Uncontested Material Facts.

Finally, the Court also notes that Plaintiff, in opposing Defendants' Motion for Summary Judgment, submitted an unsworn statement under penalty of perjury in an attempt to create issues of material fact.  The First Circuit has refused, on numerous occasions, to allow issues of fact to be created simply by submitting a subsequent contradictory affidavit.  Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."); see also Torres v. E.I. DuPont De Nemours & Co., 219 F.3d 13, 20-21 (1st Cir. 2000); and Morales v. A.C. Orssleff's EFTF, 246 F.3d 32 (1st Cir. 2001).

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 6

In the case at bar, Plaintiff was deposed on *three* (3) different occasions, where he had ample opportunity to explain his answers and the factual basis for his claims.  Plaintiff cannot come now, at the eleventh hour, and create issues of fact when his deposition testimony was clear and unambiguous.  Even worse, in the opposition, rather than itemizing each proffered fact separately with reference to its particular evidentiary source as the Local Rule requires (which would then have allowed Defendant the opportunity to address them individually), Plaintiff would have the Court extrapolate material facts to the controversy at hand from his sworn statement, as  Plaintiff  fails to specifically cite to the page and item number of the affidavit when referring to the affidavit.  The result of this is that it leaves the Court to do Plaintiff's work in combing his statement to find the necessary evidence, which is precisely what the Local Rules seek to avoid.  Accordingly, the Court will not consider Plaintiff's declaration, and has disregarded the same in its analysis.

In light of the documentary evidence before it, the Court deems the following facts to be uncontested[1].

1.    Plaintiff Rivera started working for Universal on June 22, 2004.  See, D. Exhibit # 1, Plaintiff's Deposition, dated October 3, 2012, p. 43, l. 22-24; p. 44, l. 1-5.

2.    When Rivera first started working at Universal in 2004, he held the position of Claims Representative in charge of opening insurance claims. Rivera worked at the Claims Department in the Metro Office Park location in Guaynabo, Puerto Rico,

---

[1] All the proposed statements of uncontested material facts submitted were considered and analyzed. As such, all those which are uncontested are included herein as findings of fact even though some may be irrelevant for purposes of this Opinion and Order, which concludes that the ADA claims are time-barred.

under the supervision of Mrs. Aileen Rosado ("Rosado"). See, D. Ex. # 1, p. 44, l. 6-24; p. 45, l. 1-7; D. Exhibit # 35, Claims Representative job description signed on May 24, 2005.

3.      Rivera held the position of Claim Representative until 2008, when the Claims Department was restructured as a Contact Center. The Contact Center grouped all telephone representatives in one place, in an office located in Caguas, Puerto Rico. See, D. Ex. # 1, p. 46, l. 17-24; p. 47, l. 1-16.

4.      At this time, Plaintiff's position was that of Service Specialist. The Contact Center's vision was that every representative be trained in all areas so that they could take all kinds of calls and serve all three (3) companies, and not simply take calls pertaining to insurance claims. For instance, the idea was that service specialists could take calls pertaining to claims of the various insurance companies associated to Universal; make collections; certify insurance coverage; provide service to banks; reestablish insurance policies; make endorsements; receiving endorsements; servicing producers, and so on.  See, D. Ex. # 1, p. 47, l. 14-24; p. 48, l. 19-24; p. 49, l. 1-17; D. Ex. # 5, Plaintiff's second Deposition, dated October 11, 2012, p. 8, l. 9-23; D.  Ex. # 34, Rosado's Statement, ¶ 2; and D. Ex. # 36, Contact Center's Customer Care Representative job description.

5.      When Plaintiff was transferred to the Contact Center, he continued to be a telephone representative, but the kind of calls he received was expanded. See, D. Ex. # 1, p. 49, l. 18-24; p. 50, l. 5-13.[2]

6.      Regardless of the change of his position title, Plaintiff's duties were always to answer calls and these duties required him to be seated in a desk available to take calls all the time. See, D. Ex. # 1, p. 50, l. 1-4.

7.      After the change in his position title and transfer to Caguas, Plaintiff continued to be seated in a desk. However, instead of one (1) computer monitor, Plaintiff started working with two (2) to ease the process of gathering data during a call. See, D. Ex. # 1, p. 50, l. 14-24; p. 51, l. 1-15.[3]

8.      Also, there was a time when Universal went "green" or paperless, and created a system where representatives could gather all necessary documents and information without leaving their desks. See, D. Ex. # 1, p. 52, l. 13-24; p. 53, l. 1-6.

9.      Plaintiff explained during his deposition that being a representative or service specialist required the employee to be seated virtually all the time. As per Plaintiff's deposition testimony, it was very difficult for any representative to even go to the

---

[2] Plaintiff "qualified" this statement of fact, yet failed to provide any reasoning, citation or other supporting evidence for this qualification. Therefore, this fact, and all others in similar vein, must be deemed admitted.

[3] Although Plaintiff qualified this statement and supplied a citation to the record for this fact, the qualification offered does not contradict the proposed fact. Plaintiff counters this statement with "Defendants became paperless and Rivera could not get up from his desk to pick up documents from the printer". While Plaintiff's proffered statement may serve to perhaps add information about Plaintiff's condition, the facts as proffered, even if considered, cannot serve to deny that Plaintiff was seated at a desk in Caguas and he had two monitors instead of one. Insofar as this denial is not properly supported, it must be deemed as admitted pursuant to the rules. Furthermore, Plaintiff's proffered explanation offers additional facts that should have been included in a separate reply statement of material facts. Therefore, this fact, and all others like it, are in violation of the rules and will not be considered by the Court.

bathroom. Plaintiff testified that insofar as the Claims Department was the one that received the most calls ("demasiadas") sometimes the employees were not allowed to get up to go to the bathroom and assimilated the situation to students in a classroom setting. See, D. Ex. # 1, p. 53, l. 7-24; p. 54, l. 1-20; D.Ex. # 5, p. 46, l. 4-24; p. 47, l. 1-22.

10.  According to Plaintiff, the possibilities of someone from the Claims Department of being able to go to the bathroom were lower than those of someone from another department which received less calls. See, D. Ex. #1, p. 54, l. 3-9.

11.  At one point, representatives were informed that the department received so many calls that in order for a representative to be able to take a break, he or she had to request it in advance. See, D. Ex. # 1, p. 57, l. 10-24; p. 58, l. 1-21.

12.  Supervisors (Aileen Rosado and Lilliam Ortega) informed that breaks could be granted if the volume of calls was very low. However, it was very difficult for anyone to be granted a break. See, D. Ex. # 1, p. 58, l. 16-24; p. 59, l. 1-20.

13.  All representatives in charge of taking claims, like Plaintiff, constantly received a lot of calls, or as Plaintiff explained, "too many". Thus, according to Plaintiff, being able to take a break or even go to the bathroom was a difficult task. See, D. Ex. # 1, p. 53, l. 11-22; p. 54, l. 3-12, p. 59, l. 3-15.

14.  When Plaintiff first started working in 2004, he received a copy of the rules applicable to his work area. He acknowledged receipt of the rules of conduct.  See, D. Ex. # 5, p. 12, l. 9-24; p. 13, l. 1-4; D. Ex. # 6, Customer Area Rules, dated December 30, 2004, p. 1.

15.  According to the rules of conduct, all calls performed by the service representative would be recorded and monitored. See, D. Ex. # 6, p. 1.

16.  According to Plaintiff, supervisors would monitor calls approximately ten to twelve times a month. See, D. Ex. # 5, p. 150, l. 11-14.

17.  Personal calls were not permitted in the work area; these had to be made during the representative's approved breaks, or after obtaining permission from the supervisor. See, D. Ex. # 6, p. 1.

18.  The use of cellphones in the work area was not permitted. They had to be put in silent mode. Also, in order to use cellphones during working time, a representative had to obtain permission from the supervisor. See, D. Ex. # 6, p. 1.

19.  If a representative had to be absent he/she had to inform it directly to the supervisor. If the absence was related to a pre-arranged appointment, it had to be notified at least three (3) days in advance.  See, D. Ex. # 6, p. 2.

20.  According to the rules, if an employee had to leave his or her workstation momentarily, the employee had to obtain permission from the supervisor in advance. See, D. Ex. # 6, p. 2.

<u>Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al</u>
Civil No. 11-2260  (CVR)
Opinion and Order
Page 11

21.     On April 6, 2006, Rosado gave Plaintiff a written disciplinary memorandum because

he was showing a pattern of absenteeism and lateness.  <u>See</u>, D. Ex. # 34, ¶ 9; D. Ex.

# 34C, Memorandum dated April 6, 2006, p. 1.

22.     According to the disciplinary memorandum, from the period between October 2005

through March 2006, Plaintiff was late eleven (11) times; was absent for two (2)

whole days; and had two (2) fractioned absences. <u>See</u>, Ex. # 34, ¶ 10; D. Ex. # 34C,

p. 1.

23.     Plaintiff was reminded by Rosado that excessive absenteeism and/or lateness

violated Universal's Manual of Norms of Behavior, and would not be tolerated. <u>See</u>,

Ex. # 34, ¶ 11; D. Ex. # 34C, p. 1.

24.     Plaintiff received the disciplinary memorandum but refused to sign the document.

<u>See</u>, Ex. # 34, ¶ 12; D. Ex. # 34C, p. 1.

25.     Because of this, on April 17, 2006, Mrs. Luz M. Pérez, from Human Resources, sent

Plaintiff an email requesting him to put in writing the reasons why he was not in

agreement with the memo. <u>See</u>, D. Ex. # 34C, p. 2. The same day, Plaintiff replied

alleging that his supervisor had not alerted him of the issue before the memo. <u>See</u>,

D. Ex. # 34C, p. 2.

26.     On February 13, 2007, Plaintiff was evaluated for his performance during year 2006.

Plaintiff signed the evaluation acknowledging receipt. <u>See</u>, D. Ex. # 34, ¶ 14; D. Ex.

# 34D, Plaintiff's Performance Evaluation on 2006; D. Ex. # 5, p. 85, l. 13-24; p. 86,

l. 1-2.

27.    In the Performance Evaluation for 2006, Rosado gave Plaintiff a qualification of "Does not meet the competence in a consistent manner" under the Personal Responsibility area. Said area evaluated Plaintiff's compliance with the company rules, including attendance and punctuality. Rosado stated that Plaintiff had nine incidences during the year, and received a disciplinary memorandum in April of 2006 in relation to his absences and tardiness. Plaintiff received a "Satisfactory" grading in seven other areas and an "above average" grade in one area.  See, D. Ex. # 34D, p. 4.

28.    Rosado mentioned in the evaluation for 2006 as areas to improve: improving attendance and punctuality; and improving productivity.   In the evaluation, regarding his absences, Plaintiff commented "They are due to a condition that my work area did not help with at all, but thanks to my supervisors and human resources who have been cooperating, this will be improving considerably".  See, D. Ex. # 34, ¶ 16;D.   Ex. # 34D, p. 6.

29.    According to Universal's attendance record, Plaintiff's absences during the years of 2007-2011 were as follows:

a.      During the year 2007, Plaintiff was absent from work a total of 244.25 hours (32.57 days), in addition to Holidays and Vacation days. See, D. Ex. # 10, Elizabeth Berrios' Statement, ¶ 17a; D. Ex. # 10J, Plaintiff's Punch Detail from 2006 thru 2011, bates nos. 1275-1283. [4]

---

[4] Sick days are identified as (S) in the punch list; personal days are identified as (P).

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 13

b.      Plaintiff's absences during the year 2007 were charged to various licenses as follows: 1) 148.75 hours (19.83 days) to sick leave; and 2) 95.5 hours (12.73 days) to personal time. See, D. Ex. # 10, ¶ 17b; D. Ex. # 10J, bates nos. 1275-1283.

c.      In 2007, there were 232 work days (excluding weekends, Holidays and Plaintiff's vacation days). Thus, Plaintiff was absent 14.04% of the time that year, in addition to Holidays and vacation days. [5]  See, D. Ex. # 10, ¶ 17c; D. Ex. # 10J, bates nos. 1275-1283.

d.      During the year 2008, Plaintiff was absent from work a total of 212.25 hours (28.3 days). See, D. Ex. # 10, ¶ 17d; D. Ex. # 10J, bates 1284-1292.

e.      Plaintiff's absences during the year 2008 were charged to various leaves as follows: 1) 117 hours (15.6 days) to sick leave; and 2) 95.25 hours (12.7 days) to personal time. See, D. Ex. # 10, ¶ 17e;D. Ex. # 10J, bates nos. 1284-1292.

f.      In 2008, there were 236 workdays (excluding weekends, Holidays and Plaintiff's vacation days). Thus, Plaintiff was absent 12% of the time that year, in addition to Holidays and Vacation days. [6] See, D. Ex. # 10, ¶ 17f; D. Ex. # 10J, bates nos. 1284-1292.

_____

[5] 32.57 days of absence ÷ 232 workdays.

[6] 28.30 days of absence ÷ 236 workdays.

<u>Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al</u>
Civil No. 11-2260 (CVR)
Opinion and Order
Page 14

g.      During the year 2009, Plaintiff was absent from work a total of 368.25 hours (or 49.1 days), in addition to Holidays and Vacation Days.  <u>See</u>, D. Ex. # 10, ¶ 17g; D.  Ex. # 10J, bates nos. 1293-1301.

h.      Plaintiff's absences during the year 2009 were charged to various leaves as follows: 1) 229 hours (30.53 days) to personal time; and 2) 139.25 hours (18.57 days) to sick leave. <u>See</u>, D. Ex. # 10, ¶ 17h; D. Ex. # 10J, bates nos. 1293-1301.

i.      In 2009, there were 244 working days (excluding Holidays, Vacation and weekends). Thus, that year, Plaintiff was absent 20.12% of the time, in addition to Holidays and Vacation days. [7] <u>See</u>, D. Ex. # 10, ¶ 17i; D. Ex. # 10J, bates nos. 1293-1301.

j.      During the year 2010, Plaintiff was absent from work a total of 453.25 hours (or 60.43 days). <u>See</u>, D. Ex. # 10, ¶ 17j; D. Ex. # 10J, bates nos. 1302-1310.

k.      Plaintiff's absences during the year 2010 were charged to various leaves as follows: 1) 108.5 hours (or 14.47 days) charged to his sick leave; and 2) 344.75 hours (or 45.96 days) charged to personal time.  <u>See</u>, D. Ex. # 10, ¶ 17k; D. Ex. # 10J, bates nos. 1302-1310.

---

[7] 49.10 days of absence ÷ 244 workdays.

l.      In 2010, there were 238 workdays (excluding Holidays, weekends, and Plaintiff's vacation days). Thus, Plaintiff was absent 25.39% of the time, in addition to Holidays and Vacation days.  See, D. Ex. # 10 ¶ 17l; D. Ex. # 10J, bates nos. 1302-1310.

m.     During the year 2011, Plaintiff was absent from work a total of 60 hours (8 days). See, D. Ex. # 10, ¶ 17m; D. Ex. # 10J, bates no. 1311.

n.      Plaintiff's absences on 2011 were charged to various licenses as follows: 1) 37.5 hours (5 days) to Sick leave; and 3) 22.5 hours (3 days) to personal time. See, D. Ex. # 10, ¶ 17n; D. Ex. # 10J, bates no. 1311.

o.      During the period of time Plaintiff worked for Universal in 2011, prior to his resignation effective February 2, 2011, there were only 21 workdays. Thus, Plaintiff was absent 38.10% of the time, in addition to Vacation days and Holidays.[8]  See, D. Ex. # 10, p. 7; D. Ex. # 10J, bates no. 1311.

30.   In 2009, Plaintiff was evaluated by his supervisor, Rosado. One of the goals of the position was for the representative to spend less than five percent (5%) in Auxiliary time, which is time the representative checks out of the system for personal matters and is not available to take calls. See, D. Ex. # 15, p. 117, l. 5-11; D. Ex. # 37,  Rosado's deposition taken on July 8, 2013, p. 24, l. 6-20; p. 25, l. 1-7; D. Ex. # 32, Plaintiff's Mid-Year Evaluation 2009, p. 2.

---

[8] 49.10 days of absence ÷ 244 workdays.

31.   Plaintiff's average of auxiliary time for 2009 was 12%. Rosado indicated that Plaintiff had to improve his Auxiliary time. See, D.  Ex. # 15, p. 117, l. 5-19; D. Ex. # 32, p. 2.

32.   In response to this recommendation for improvement, Plaintiff explained that his Auxiliary Time was due to the fact that he took fifteen (15) minutes breaks twice a day to take a snack and medication, which his supervisor was aware of. He also indicated that he allegedly had to stand and walk around every 15 or 30 minutes per orders from the State Insurance Fund (workman's compensation). See, D. Ex. # 15, p. 117, l. 3-25; p. 118, l. 1-21; D. Ex. # 32, p. 6.

33.   On November 23, 2009, Plaintiff sent an email to Berríos, Human Resources Specialist, telling her the following: "As you know, I am still under the State Insurance Fund, but in hearings with the Industrial Commission, working with attorneys in my case, which you already know about, between support therapies assigned by the Fund and my medical appointments while the doctors make a determination. This two-week period and the one before it I have lost too many hours because I don't have any accrued sick leave. I want to see if I have the right or if you could help me compensate some of these hours with the hours that I have accrued for vacation leave." See, D. Ex. # 10D, email chain between Plaintiff and Mrs. Berríos regarding depletion of his sick leave and request for vacation leave.

34.   The same day, Berríos replied " The State Insurance Fund leave is an unpaid leave, but the employee has the option of charging the days to a sick leave if he has the balance available. You currently have 4.60 sick hours and cannot use more than that

for now, until you accrue again. Sick leave accrual is 9.38 hours per month. Regarding vacation leave, you currently have 8.5 days accrued, of which 1 day is due. Remember that vacation leave days are granted once they become due; in other words, after the employee's anniversary date with the company. In order to make any charges you must consult with your immediate supervisor." See, D. Ex. # 10D.

35.    In his mid-year evaluation, Plaintiff's supervisor informed Plaintiff that he had not met the goal to maintain auxiliary time below 5%. Plaintiff's auxiliary time for the period under review was 13%, greater than in 2009.  See, D. Ex. # 33, p. 1.

36.    According to Plaintiff's sworn deposition testimony, while he worked for Universal his purported conditions and the ones upon which he anchors his disability discrimination claim were: herniated discs (cervical neck area), and spasms in his lower back. See, D. Ex. # 1, p. 61, l. 6-23; p. 62, l. 1-24; p. 63, l. 1-15.

37.    According to Plaintiff, his conditions while he worked for Universal did not impede him from performing his work in any way. See, D.  Ex. # 1, p. 64, l. 1-4, l. 11-17; p. 65, l. 2-12.

38.    Plaintiff also testified during his deposition that his conditions did not impede him from doing anything at all. Plaintiff only "took precautions" when required to lift heavy things (i.e. a box full of books), and he requested someone else to do it. He would not lift a twenty five (25) pound dumbbell out of precaution. See, D. Ex. # 1, p. 64, l. 21-23; p. 65 l. 15-24; p. 66, l. 1-14.

39.     Plaintiff took these precautions because he knew his conditions were degenerative and if he did not take the necessary precautions, it would progress further. See, D. Ex. # 1, p. 68, l. 1-7.

40.     Aside from taking the precaution of not lifting heavy objects, Plaintiff's "conditions" while he worked at Universal did not affect his life at all. See, D. Ex. # 1, p. 68, l. 15-21; p. 73 l. 7-13.

41.     According to Plaintiff's expert, Dr. Néstor Cardona, Rivera did not explain to him how his "conditions" affected his daily life. See, D. Ex. # 2, Dr. Cardona's deposition, p. 36, l. 9-15.

42.     Plaintiff testified that at the current time, his conditions are worse than before. According to Plaintiff, now he cannot walk long distances or bend like he used to do. See, D. Ex. # 1, p. 68, l. 22-24; p. 69, l. 1-5.

43.     Plaintiff testified during his deposition that his biggest problem or limitation, and what is his main concern and preoccupation, is that his intimacy with his wife is not as it used to be before, because he does not have the capacity to do the things he could do before and is essentially limited to having sexual relations with his wife in only one position. See, D. Ex # 5, p. 221, l. 22-24; p. 222, l. 1-9; p. 227, l. 7-23; p. 228, l. 3-5.

44.     Plaintiff testified during his deposition that when he started requesting accommodations at Universal, his conditions were small or limited, and that now his conditions are big, more incapacitating. See, D. Ex. # 5, p. 226, l. 5-10.

45. On April 21, 2005, Rivera told his treating physician, Dr. Eugenio Barbosa, that he had a history of lumbar spasms. In physical exam, Dr. Barbosa noted that Plaintiff presented left subscapular pain, which increased with right lateral rotation and hyperextension, and provided a diagnosis of back spine pain. <u>See</u>, D. Ex. # 9, copy of medical record produced by Dr. Barbosa, bates no. 667.

46. Plaintiff testified that he first noted he was feeling pain sometime before he was referred to the State Insurance Fund, which occurred in May, 2007.  At the time he visited a private doctor who told him he should request a copy of his chair's manual. His supervisor (Rosado) gave him the manual and he took it to his doctor, whose name he cannot remember. <u>See</u>, D. Ex. # 1, p. 69, l. 6-24; p. 70, l. 1-5; D. Ex. # 5, p. 77, l. 4-24; p. 78, l. 1-5.

47. After reviewing the manual, the doctor told him he should change his chair. Rosado referred Plaintiff to Puerto Rico's Workmen Compensation at the State Insurance Fund (" SIF"). <u>See</u>, D. Ex. # 1, p 69, l. 6-24; p. 70, l. 1-8; D.  Ex. # 5, p. 77, l. 6-23; p. 78, l. 2-5; p. 234, l. 5-9.

48. The modification to Plaintiff's chair was the only recommendation made by a private physician. <u>See</u>, D. Ex. # 5, p. 78, l. 18-24.

49. All other recommendations and/or requests for accommodation to Universal stemmed from the SIF's Ergonomic Report, dated October 18, 2007. <u>See</u>, D. Ex. # 5, p. 78, l. 18-24; p. 79 l. 1-4.

50.    Plaintiff's first case with the SIF was filed on May 22, 2007. The case number was 07-64-05041-4 and his condition was described as lumbar strain and strain in right shoulder. <u>See</u>, D. Ex. # 5, p. 32, l. 7-12; D. Ex. # 7, Claim filed at the SIF on May 5, 2007.

51.    After Plaintiff went to the SIF upon Rosado's referral, agency personnel visited Plaintiff's work area an issued an Ergonomic Report dated October 18, 2007. Plaintiff stated during his deposition that he did not receive a copy of the report during his employ at Universal. <u>See</u>, D. Ex. # 5, p. 32, l. 13-15; p. 33, l. 10-22; p. 34, l. 3-24; D. Ex. # 4, SIF Ergonomic Report dated October 18, 2007; D.  Ex. # 10, ¶ 3.

52.    After personnel from the SIF went to visit his work area, they educated him regarding his conditions and according to Plaintiff, this is why he started taking precautions. As per Plaintiff's sworn deposition testimony, at the time his condition was "minimal". <u>See</u>, D. Ex. # 1, p. 73, l. 14-24; p. 74, l. 1-5.

53.    According to the SIF's doctors, in 2007 Plaintiff was diagnosed with a "cervical and dorsal lumbar sprain" (esguince dorsal), which, according to Plaintiff's expert, is a typical diagnosis at the SIF. <u>See</u>, D.  Ex.# 2, p. 38, l. 16-24; p. 39, l. 1-21.

54.    According to Plaintiff's expert, Dr. Cardona, the diagnosis reached by the SIF (cervical and dorsal sprain) was probably the best diagnosis given the evidence the SIF had at the time. In 2007, there was no evidence of herniated discs, fractures, or spinal stenosis. <u>See</u>, D. Ex. # 2, p. 38, l. 16-24; p. 39, l. 1-24.

55.  According to Plaintiff's expert, there was no evidence that Plaintiff suffered from herniated discs, but there was evidence of degenerated discs. <u>See</u>, D. Ex. # 2, p. 40, l. 1-3.

56.  According to Plaintiff's expert, his current diagnoses are chronic cervical pain with radiologically confirmed acquired spinal stenosis and chronic myofascial low back pain. <u>See</u>, D. Ex. # 3, p. 4; D. Ex. # 2, p. 57, l. 8-13.

57.  As to the first diagnosis (spinal stenosis), Plaintiff's expert testified that there was no medical evidence of said condition in 2008. According to an MRI performed on Rivera in January of 2008, Rivera only had some degenerative changes which were a normal result of aging; that is, the results of the MRI performed in January of 2008 were normal. <u>See</u>, D. Ex. # 2, p. 31, l. 5-18.

58.  The second diagnostic impression (myofascial low back pain), however, according to Plaintiff's own expert "is no biggie... there's nothing in any radiologic study to point out to a problem with a disc or degenerative disc disease or anything significant." <u>See</u>, D. Ex. # 2, p. 81, l. 8-12.

59.  On July 14, 2008, after providing to Plaintiff the maximum treatment, the SIF closed Plaintiff's case No. 07-64-05041-4 and released him definitely without any incapacity. <u>See</u>, D. Ex. # 7A, Release from Case # 07-64-05041-4.

60.  On October 3, 2008, Plaintiff opened another case before the SIF, case number #09-64-1374-5. <u>See</u>, D. Ex. # 8, SIF claim number # 09-64-1374-5.

61.     The SIF's Administrator's decision on treatment for Plaintiff stated that Plaintiff was to receive treatment while continuing to work (commonly referred to as "CT"). See, D. Ex. # 5, p. 56, l. 9-24; p. 57, l. 1-2; D. Ex. # 8.

62.     On June 1, 2009, Plaintiff informed his supervisor that virtually all of his appointments, except for two (2), were outside working hours and that after June 26, 2009 he would not receive further medical treatment at that time. See, D. Ex. # 8B, email from Plaintiff to Rosado on June 1, 2009.

63.     On June 26, 2009, Plaintiff was released from the SIF with a five percent (5%) incapacity because of cervical strain and 5% because of lumbar strain. Plaintiff appealed this decision, but it was affirmed. See, D. Ex. # 8A, Resolution of case 09-64-1374-5 from the SIF dated September 15, 2009.

64.     On August 12, 2009, Mrs. Veronica Vidal, from Universal's Human Resources Department, called the SIF to confirm the status of Plaintiff's case and whether an accommodation was warranted. Vidal informed Johanna Monge ("Monge") and Elizabeth Berrios ("Berrios") via email that "...as long as an accommodation or restriction in the workplace is warranted, instructions to those effects will be issued in the documents confirming that the case has been closed with disability. She told me that a case with 5% disability does not warrant any type of restriction or accommodation." See, D. Ex. # 10, ¶ 4; D. Ex. # 10E, email from Vidal to Monge and Berrios dated August 12, 2009.

65.   On March 1, 2012, the SIF issued a resolution in Case # 09-64-1374-5, concluding that the lesion causing the lumbar strain (esguince dorsal) healed completely. See, D.  Ex. # 5, p. 73, l. 5-10; p. 74, l. 9-16; D.  Ex. # 8C, Resolution of case # 09-64-1374-5 from SIF dated March 1, 2012.

66.   As of the time of his deposition, Plaintiff testified that he was still appealing said decision from the SIF. See, D. Ex. # 5, p. 74, l. 20-24.

67.   In the years 2007 and 2010, Plaintiff also underwent two (2) electro diagnostic examinations, both of which were found to be within the normal limits. This confirmed that there was no nerve impairment, and that Plaintiff's pain was muscular in nature. See, D. Ex. # 3, p. 3; D. Ex. # 2, p. 56, l. 17-24; p. 57, l. 1-7.

68.   On January 13, 2010, Plaintiff filed yet a third case (Case No. 10-64-02743) before the SIF for an alleged emotional condition, which he alleged was due to the stress he was suffering because of his supervisor and Human Resources Specialist, Berríos. See, D. Ex. # 5, p. 59, l. 19-24; p. 60, l. 1-23; D. Ex. # 8F, Claim filed on January 13, 2010, Case No. 10-64-02743.

69.   On December 28, 2010, the SIF closed Plaintiff's Case 10-64-02743 upon concluding that his emotional condition was not work related. See, D. Ex. # 5, p. 61, l. 7-18; D. Ex.#8E, SIF's Resolution of case no. 10-64-02743 concluding that Plaintiff's emotional condition was not work related, dated December 28, 2010.

70.   In January of 2011, Plaintiff opened a fourth case with the SIF because of pain in the neck, shoulder, and right arm. See, D. Ex. # 5, p. 71, l. 1-15.

71. On January 28, 2011, the SIF Administrator's Decision Regarding Medical Treatment stated that Plaintiff was to receive treatment while continuing to work. See, D. Ex. # 8D, SIF's resolution ordering treatment while continuing to work, dated January 28, 2011.

72. Plaintiff was released from treatment sometime in 2011 with 25% incapacity, when he was no longer working for Universal. See, D. Ex. # 5, p. 72, l. 17-24; p. 73, l. 1-4.

73. On August 25, 2011, Dr. Barbosa noted that Rivera hurt his right shoulder while painting the roof of his house and was presenting pain and swelling in the right sternum clavicular joint. See, D. Ex. # 9, bates no. 686.

74. According to Plaintiff's expert, in June of 2011, Plaintiff's "degenerative disc disease...had progressed from early degenerative disc changes to advanced changes in a period of approximately three years." See, D. Ex. # 3, p. 4.

75. According to Plaintiff's expert report, the rapid degeneration could only be explained by repetitive trauma. See, D. Ex. # 3, p. 4.

76. Plaintiff's expert testified that these changes could be related to any kind of injury, not necessarily work related. See, D. Ex. # 2, p. 60, l. 23-24; p. 61, l. 1-9.

77. According to Plaintiff's expert, as of October 2012, when he rendered his report, Plaintiff was "completely and permanently disabled to engage in any gainful employment." See, D. Ex. # 3, p. 4; P. Ex. # 2, p. 83, l. 17-19.

78. According to Plaintiff, when he first started feeling pain, he complained that his chair was causing him pain in his back. At the time, Rosado gave him a catalogue

from Office Max so he could select another one and told him that she would also place an order for a chair accessory. See, D. Ex. # 1, p. 70, l. 23-24; p. 71, l. 1-24; p. 72, l. 1-8.

79.  Rosado indeed placed an order for an accessory that was like a curved cushion to place in Plaintiff's back for support. According to Plaintiff, Rosado read the catalogue which stated that the accessory would help him correct his posture and Rosado understood the accessory would help him. For a period of time, Plaintiff felt comfortable with it and it provided him some relief. See, D. Ex. # 1, p. 70, l. 23-24; p. 71, l. 1-24; p. 72, l. 1-8; D. Ex. # 5, p. 87, l. 8-24.

80.  On his 2006 evaluation, Plaintiff wrote in the comments section that he was working on improving his attendance, and wrote that his absences were due to his medical condition (lumbar condition), which his work was not helping at all. He expressed being grateful to his supervisor and Human Resources for their support, and noted that because of said support everything was improving. See, D. Ex. # 5, p. 86, l. 3-12; D. Ex. # 34D, p. 6.

81.  Plaintiff acknowledged during his deposition that when he thanked his supervisor and Human Resources, he was referring to his supervisor Rosado and Mrs. Cruz from Human Resources. See, D. Ex. # 5, p. 90, l. 10-24; p.91, l. 1.

82.  At the time, Plaintiff believed Rosado and Universal's Human Resources Department were helping him because they provided him with the accessory for his chair, which they thought would help his pain and discomfort. Plaintiff conceded under oath that

when he wrote that comment in the evaluation, he was being sincere. See, D. Ex. # 5, p. 91, l. 23-34; p. 92, l. 1-6.

83.  After the chair accessory was added, Plaintiff continued experiencing pain and/or discomfort and that is when Rosado referred him to the SIF. See, D. Ex. # 1, p. 72, l. 15-24; p. 73, l. 1-6.

84.  Although Plaintiff acknowledged that the back support provided by Rosado helped him at the first and gave him some relief, he stated that it allegedly made his condition worse. See, D. Ex. # 5, p. 86, l. 20-24; p. 87, l. 1-7.

85.  The report provided four (4) recommendations: two (2) directed at the Plaintiff, and the other two (2) directed at Universal. See, D. Ex. # 4.

86.  The SIF issued two (2) recommendations to Plaintiff: 1- to stand up to pick up papers at the printer, and, 2- to stretch for up to one (1) minute, two (2) times a day. See, D. Ex. # 2, p. 49, l. 12-24; p. 50, l. 1; D. Ex. # 5, p. 34, l. 3-24; D. Ex. # 4; D. Ex # 10 ¶ 3.

87.  The SIF issued two (2) recommendations to Universal: 1- to elevate the monitor by five (5) inches; and 2- to provide a document holder. See, D. Ex. # 2, p. 50, l. 2-17; D. Ex. # 5, p. 34, l. 3-24; D. Ex. # 4; P. Ex # 10 ¶ 3.

88.  The SIF's Ergonomic Report does not make any reference to a 15 or 30 minute break. See, D. Ex. # 4.

89.   At the time the SIF inspected Plaintiff's work area, the SIF noted that Rivera's chair and the integrated lumbar support was adequate. The SIF elevated the lumbar support and adjusted the tension of the chair's back support. See, D. Ex. # 4.

90.   The SIF's Ergonomic Report, dated October 18, 2007, also noted that Plaintiff's computer's monitor was elevated to an adequate level at five (5) inches from his desk. At the time, the monitor was placed on top of a box and a telephone book. See, D. Ex. # 4; D. Ex. # 5, p. 35, l. 17-24; p. 37, l. 8-16.

91.   Rosado was the one who recommended Plaintiff to place the monitor on top of the box and the phonebook to provide the required elevation, while Universal could provide an artifact to elevate the monitor. See, D. Ex. # 5, p. 37, l. 8-16.

92.   According to Plaintiff, his supervisor later told him that having the monitor placed on top of a box and a telephone book was dangerous because it could fall on top of him, and told him to remove the box and the phonebook. The monitor allegedly was then placed on the desk again. See, D. Ex. # 5, p. 37, l. 2-23; p. 38, l. 1-24; p. 39, l. 1-7.

93.   According to Plaintiff, the monitor was elevated in the box and the book for a "short time" and it was elevated early in 2009 with an artifact (arms which held up monitors to the height Rivera needed). See, D. Ex. # 5, p. 40, l. 1-5; p. 201, l. 5-16; p. 202, l. 7-19; p. 203, l. 5-24; p. 204, l. 1-4, 8-19; p. 205, l. 3-9.

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 28

94.    Plaintiff also acknowledged that Universal provided him with a document holder more or less two (2) years after the SIF's Ergonomic Report was issued. <u>See</u>, D. Ex. # 5, p. 42, l. 15-18.

95.    Plaintiff also acknowledged that Universal granted him two 15-minute breaks sometime in 2009, after the transfer to Caguas. <u>See</u>, D. Ex. # 5, p. 42, l. 23-24, p. 43, l. 1-9.

96.    Plaintiff admitted he could do the exercises recommended by the SIF during lunch. <u>See</u>, D. Ex. # 5, p. 211, l. 14-19. As per the Ergonomic Report, the SIF's recommendation was that Plaintiff perform these stretching exercises twice a day, for up to one (1) minute. <u>See</u>, D. Ex. # 4.

97.    Also, the SIF noted that, at the time of their inspection, Plaintiff had been provided a keyboard tray, which he did not make use of. <u>See</u>, D. Ex. # 2, p. 51, l. 12-17; D. Ex. # 4.

98.    Aside from these recommendations, the SIF provided Plaintiff with a manual with some stretching exercises he should perform at work, two times a day for up to one (1) minute. <u>See</u>, D. Ex. # 5, p. 48, l. 6-24; p. 49, l. 1-10.

99.    Plaintiff would do the stretching exercises recommended by the SIF on the breaks granted by Universal; the breaks were granted usually in the morning and almost never in the afternoon. <u>See</u>, D. Ex. # 5, p. 50, l. 1-24; p. 51, l. 1-13.

100.   On February 3, 2010, Vidal, from Human Resources sent an email to the Contact Center inviting all employees to a seminar to be offered regarding "Ergonomics in

the Workplace". Plaintiff received this email. See, D. Ex. # 5, p. 99, l. 18-24; p. 100,

l. 1-11; D. Ex. # 10, ¶ 8; D.  Ex. 10C, email dated February 3, 2010 from Vidal to

Contact Center Employees.

101.    The e-mail stated that it would be offered by specialists in the field who would

provide advice regarding proper posture, and positioning of the various work tools.

The email indicated that it would be offered as a "Lunch & Learn" and would last 45

minutes. The offering of the seminar would be tailored according to the employee's

lunch time. See, D. Ex. # 10, ¶ 8; D.  Ex. 10C.

102.    Plaintiff did not attend the seminar. See, D.  Ex. # 5, p. 101, l. 17-24; p. 102, l. 1-3.

103.    Plaintiff also testified that the SIF prescribed him a medication that he had to take

with food because the medication was strong on the stomach. According to Rivera,

this is the reason why Universal granted him two 15-minute breaks sometime in

2009. See, D. Ex. # 5, p. 49, l. 12-24; p. 50, l. 1-6.

104.    On January 26, 2010, Vidal and Monge reviewed Plaintiff's case, and determined

there was no evidence on file supporting the need for two (2) 15-minute breaks a

day. They determined that they would investigate further with the employee and

would review the files again. See, D. Ex. # 10G, email dated January 26, 2010

between  Vidal and Monge.

105.    On February 2, 2010, Plaintiff sent an email to Berrios telling her that he would look

in his records and provide any documentation supporting his restrictions. See, D.

Ex. # 17, email from Plaintiff to Berrios dated February 1, 2010.

106. On March 26, 2010, Plaintiff complained with Monge because when he was taking his morning break, another supervisor, Mrs. Luz Laporte ("Laporte") went to the lounge area and told him he had been in a break for ten (10) minutes already, and that she needed support taking calls. Plaintiff told Laporte he had a fifteen (15) minute break approved by Human Resources. Laporte asked him if it was a break mandated by the SIF, which Plaintiff resented because there was a co-worker with him. Plaintiff asked Monge to "remind" Laporte that he had a break approved and to keep confidential such matters. See, D.  Ex. # 20, email from Plaintiff to Monge dated March 26, 2010; D. Ex. # 5, p. 173, l. 23-24; p. 174, l. 1-24; p. 175, l. 1-10.

107. That same day, Monge replied to Plaintiff that they would talk about the issue on Monday and that they had to re-evaluate the issue about the SIF's official recommendations. See, D. Ex. # 20; D. Ex. # 5, p. 175, l. 11-16.

108. Plaintiff did not provide Human Resources with any official recommendation from the SIF to support a 15-minute break twice a day. He did supply a fax indicating the following: " I send you this document that I found in a file inside my desk, it was the paper with exercises that they left me when they came by the office from the Fund and they examined the work area. I understand that they gave a copy to Rosado or to Mr. Alvarez at that moment. Anyway, I am locating the others to send them to you."  He does not remember who recommended the breaks. See, D. Ex. # 10, ¶ 15; D. Ex. # 15, p. 26, l. 11-23, p. 27, l. 3-22; p. 87, l. 1-16.

109.   On July 9, 2010, Berrios sent a letter to Mr. Roberto Acevedo ("Acevedo"), Regional Director from the SIF, requesting the status of Plaintiff's cases before the SIF, and inquiring as to whether there was any official recommendation to Universal with regards to those cases. See, D. Ex. 10, ¶ 11; D.  Ex. # 10H, letter from Berrios to SIF dated July 9, 2010.

110.   On July 21, 2010, Acevedo replied to Berrios informing her about the status of the cases.  However, he did not inform Berrios of any official recommendation or accommodation for Plaintiff at work. See, D. Ex. 10, ¶ 12; D. Ex. # 10I, letter from Acevedo to Berrios dated July 21, 2010.

111.   On August 31, 2010, Plaintiff informed Human Resources that he had requested a new headset from Rosado because the one he had caused him pain. See, D. Ex. # 15, p. 30, l. 9-25; p. 31, l. 1-3; D. Ex. # 21, chain of emails between Plaintiff and Monge, dated August 31, 2010 through September 2, 2010, p. 5.

112.   Two days later, on September 2, 2010, Monge replied to Plaintiff that she would check on his request for a headset. See, D. Ex. 15, p. 31, l. 4-16; D. Ex. # 21, p. 5.

113.   That same day, Plaintiff thanked Monge because he was provided with the headset. See, D. Ex. # 15, p. 32, l. 1-13; D. Ex. # 21, p. 4.

114.   Plaintiff alleges he requested the headset on July, 2010 from his supervisor. He was provided with the headset on September, 2010, two months after he requested it from Human Resources. See, D. Ex. # 15, p. 32, l. 17-25; p. 33, l. 1-7.

115. On September 2, 2010, Monge told Plaintiff that she was happy he received the headset, but that they had no medical recommendation for it. See, D. Ex. # 21, p. 2; D. Ex. # 15, p. 30-33.

116. Monge indicated to Plaintiff that Universal followed formal recommendations from the SIF, and that if he needed to consult something about his (medical) condition, Universal would assist him to make the proper referral to the SIF. See, D. Ex. # 21, p. 1.

117. On November 24, 2010, Plaintiff sent another email to Berrios telling her that Rosado continued to scold him for making noises; that he continued bumping into her in the lounge; that she would ask him if he was alright or if there was something wrong, even though he attempted to ignore her by looking at the ground. See, D. Ex. # 38, email from Plaintiff to Berrios regarding Rosado's alleged harassment dated November 24, 2010; D. Ex. # 5, p. 178, l. 5-24; p. 179, l. 1-3.

118. That same day, Berrios replied that she had referred the issue to Mrs. Carmen Figueroa for investigation. See, D. Ex. # 38; Ex. # 5, p. 179, l. 4-7.

119. Plaintiff replied the same day that he was not interested in anything, that it was just "for the record". See, D. Ex. # 38; D. Ex. # 5, p. 179, 8-16.

120. On April 15, 2009, Plaintiff sent an email to his supervisor, informing him of an appointment on April 24, 2009, and thanking her for her "usual cooperation with [him]". See, D. Ex. # 5, p. 106, l. 1-20; D. Ex. # 11, email dated April 15, 2009.

<u>Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al</u>
Civil No. 11-2260  (CVR)
Opinion and Order
Page 33

121.   According to Plaintiff, he started experiencing conflicts with his supervisor Rosado

since approximately May 2007, when he filed his first case with the SIF. <u>See</u>, D.  Ex.

# 5, p. 53, l. 7-15; p. 54, l. 1-8.

122.   Plaintiff testified during his deposition that the first time he felt discriminated

against due to his purported disability, was close in time to May 2007, after he filed

his first case with the SIF. <u>See</u>, D. Ex. # 5, p. 239, l. 11-23.

123.   According to Plaintiff, his supervisor, Rosado's harassment consisted of the

following:

    a.   Rosado called him "chango" ("whiny") once or twice. She told him: "stop

complaining". <u>See</u>, D. Ex. # 5, p. 230, l. 17-24; p. 231, l. 1-7.

    b.   On occasions she would let him go to medical appointments at the SIF "under

protest". <u>See</u>, D. Ex. # 5, p. 21, l. 12-24; p. 22, l. 1-2.

    c.   Plaintiff thought or perceived that his supervisor constantly monitored him

or questioned the veracity of his medical appointments. An example of this

kind of monitoring was that she would send him emails asking him to call her

if he was not going to return to work after an appointment. Plaintiff would get

upset for having to call his supervisor after his appointments because he

usually left the appointments in pain. <u>See</u>, D. Ex. # 5, p. 110, l. 14-24; p. 111,

l. 1-23; p. 112, l. 1-7; D. Ex. # 12, email dated May 11, 2009.

    d.   As per Plaintiff's testimony, another example of the kind of "monitoring" that

Rosado exerted over him was an email she sent him on October 16, 2009

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 34

asking him whether his appointment was that same day. Her email was in reply to Plaintiff's email during the morning of October 16, 2009, where he explained his appointment for the day before had been re-scheduled because of a strike. See, D. Ex. # 5, p. 121, l. 9-24; p. 122, l. 1-14; D. Ex. # 13, emails between Rosado and Plaintiff, dated October 16, 2009.

e.   As per Plaintiff's testimony, another example of Rosado's "monitoring" was that she sent him an email on December 15, 2009, asking whether his appointment for December 15, 2009 was an appointment at the SIF, or with a private physician. He thought he did not have to specify because she allegedly knew that all of his appointments were with the SIF. See, D. Ex. # 5, p. 130, l. 5-24; p. 131, l. 1-12; D. Ex. # 14, chain of emails between Rosado and Plaintiff re: appointment on December 15, 2009.

f.   According to Plaintiff, Rosado allegedly tried to convince him to "waive" his rights under the SIF and choose the benefits of CORVEL, which he rejected. See, D. Ex. # 5, p. 52, l. 14-20; p. 151, l. 11-15.

g.   Plaintiff thought that CORVEL was a program that Universal had, that would require him to swap his treatment with the SIF with private physicians. He thought this would make him lose his protected license under the SIF. See, D. Ex. # 5, p. 151, l. 11-24; p. 152, l. 1-2; p 170, l. 3-24; p. 171, l. 1-22.

h.   On March 9, 2010, Berrios met with Plaintiff and explained he had the option of taking advantage of the CORVEL program, which would assist him in

managing his license under the SIF. <u>See</u>, D. Ex. # 10, ¶ 9; D.  Ex. # 10B, email from Berrios to Plaintiff, dated March 9, 2010, re: CORVEL program, and email from Berrios to Rosado dated March 9, 2009.

i.     The CORVEL program is managed by a private entity hired by Universal. The program has the purpose of engaging the services of outside personnel to assist the employee in managing the administrative process required to maintain a workmen's compensation license, such as: coordination of appointments, appeals, providing medical documentation in response to SIF's requests, and the like. <u>See</u>, D. Ex. # 10, ¶ 10.

j.     According to Plaintiff, Rosado would not let Plaintiff stand from his desk to go get copies to the printer since there was a person assigned to distribute documents to everybody in the Claims Department and due to Universal's decision to go "green" (paperless) after the transfer to Caguas. <u>See</u>, D. Ex. # 5, p. 41, l. 1-23; p. 45, l. 22-24; p. 46, l. 1-24; p. 47, l. 1.

k.     Prior to the transfer to Caguas in 2008, Rosado would not let him stand from his desk, except to go to the bathroom, and even this was difficult at times since she would tell him he had calls to answer. <u>See</u>, D.  Ex. # 5, p. 43, l. 10-20. Plaintiff testified that after they transferred to Caguas in 2008, he was able to stand from his desk, but with some degree of difficulty. This, however, happened to everybody in the Department. <u>See</u>, D. Ex. # 5, p. 46, l. 4-24; p. 47, l. 1-22.

l.    Rosado would not let him take the 15-minute morning break, or would do so grudgingly. Sometimes she would go to the lounge area and tell him to speed things up because she needed him to answer calls. See, D. Ex. # 5, p. 49, l. 24; p. 50, l. 1-21.

m.    Rosado would let him take his 15-minute afternoon break, but with some difficulty. An example of this kind of "difficulty" was that Rosado at times would go to the lounge area to drink water or eat something while he was enjoying his break. See, D. Ex. # 5, p. 50, l. 1-24; p. 51, l. 5-17; p. 141, l. 12-17.

n.    At times Rosado would go to the lounge area where he was having his snack and medication, and asked him to return to work. She would tell him to hurry up and eat his crackers. See, D. Ex. # 5, p. 147, l. 22-24; p. 148, l. 1-3. Because of this, Plaintiff allegedly opted to take his snack with him to the bathroom and eat it there. See, D. Ex. # 5, p. 50, l. 17-19; p. 52, l. 11-16.

o.    According to Plaintiff, he would see Rosado's "chicken legs" ("patitas" in Spanish), through the bathroom door's grating. Plaintiff complained about this on January 11, 2010. At the time, Plaintiff complained that Rosado was "driving him crazy". See, D. Ex. # 5, p. 51, l. 14-24; p. 52, l. 2-16; D. Ex. # 10F, chain of emails between Plaintiff and Monge, specifically dated January 7, 2010, p. 1.

p.    Rosado started bringing lunch to eat with her subordinates in the lounge area; something she allegedly never did before. See, D. Ex. # 5, p. 141, l. 15-17.

q.   Rosado would verify Plaintiff's cases and would correct his wording and grammar (i.e. add commas, periods, or even accents (in Spanish, "acentos". i.e. "é" instead of "e"). <u>See</u>, D. Ex. # 5, p. 141, l. 18-21.

r.   Rosado would constantly monitor his calls. At times, Rosado would put the call in mute and tell him that what he was doing was wrong. <u>See</u>, D. Ex. # 5, p. 139, l. 14-24; p. 140, l. 1-15; p. 141, l. 1-7.

s.   Plaintiff testified that he could tell Rosado monitored him very frequently because he would hear a sound in the phone which suggested to him that someone had intercepted the call. <u>See</u>, D. Ex. # 5, p. 150, l. 13-19.

t.   According to Plaintiff, sometimes Rosado would tell him that what he did was wrong in front of his co-workers. <u>See</u>, D. Ex. # 5, p. 141, l. 10-12.

u.   According to Plaintiff, sometimes Rosado would yell at him. For example, if he got up from his desk, she would tell him to sit, and when Plaintiff stood anyway, she would yell "I told you to sit down." <u>See</u>, D. Ex. # 5, p. 141, l. 21-22, p. 148, l. 24; p. 149, l. 1-9.

v.   According to Plaintiff, Rosado admonished him for things which supposedly were not his doing (i.e., co-workers laughing out loud, co-workers cutting their nails, co-workers making noises).  If someone laughed aloud, Rosado would tell Plaintiff to lower his voice. <u>See</u>, D. Ex. # 5, p. 141, l. 24; p. 142, l. 1-6.

w.    If Plaintiff developed rapport with the co-worker sitting next to him, and started chit chatting with him or her, Rosado would swap the co-worker with another one. <u>See</u>, D. Ex. # 5, p. 151, l. 2-7.

x.    When Plaintiff got married, he asked for one (1) day of vacation and Rosado refused to grant him the day allegedly telling him she was tired of making concessions due to his condition. This happened in June, 2008. <u>See</u>, D. Ex. # 5, p. 145, l. 24; p. 146, l. 1-24; p. 147, l. 1-3; D. Ex. # 15, p. 165, l. 12-21. Plaintiff allegedly told Rosado that one gets married only once, and Rosado allegedly replied that was not her problem and that if he wanted to take vacation he had to change the date because she needed him at work. <u>See</u>, D. Ex. # 5, p. 147, l. 1-21.

y.    The last week before Rosado's transfer to another position, in November of 2010, she gave him training on how to do his job. Plaintiff thought this was demeaning because he trained others, thought he was one of the best in his group and believed he was more knowledgeable than Rosado. Plaintiff does not know if everyone saw it that way; but at least he thought it was demeaning. <u>See</u>, D. Ex. # 5, p. 142, l. 10-18; p. 158, l. 11-24; p. 159, l. 1-18.

z.    After Rosado was transferred to another position she received a fax from a customer, which was addressed to Plaintiff, and she forwarded it to him. Plaintiff saw this as a way of her telling him: "I'm here, I'm still watching you". <u>See</u>, D. Ex. # 5, p. 143, l. 4-18; p. 144, l. 1-4. However, Plaintiff testified

under oath that, after Rosado was transferred, he never heard anything from her again. See, D. Ex. # 5, p. 143, l. 19-23.

aa.   In January of 2010, Plaintiff requested a meeting with Human Resources to discuss the alleged harassment by Rosado. See, D. Ex. # 5, p. 162, l. 19-21; p. 163, l. 21-24; p. 164, l. 1-6; D. Ex. # 16, chain of emails between Plaintiff and Monge re: new case and harassment by Rosado, dated January 27 and January 28, 2010. According to Plaintiff, around that time (January 2010), the harassment was stronger than ever. See, D. Ex. # 5, p. 163, l. 7-24; p. 164, l. 1-8.

bb.   In December of 2010, after Rosado's transfer to another area, Mr. Francisco Melina ("Melina") came to work for the company. When Rosado introduced Plaintiff to Melina, she said: "this is the famous Ramón Rivera". Plaintiff perceived Rosado did not say it in a good way. See, D. Ex. # 5, p. 180, l. 9-24; p. 182, l. 1-20.

124.   As per Plaintiff, whenever Rosado did not let him enjoy his break fully, he would send himself an email to document the occurrence. When he was asked if he took time out of his working hours to do this, Plaintiff clarified that he took two (2) minutes out of the break Universal granted him to do so. See, D. Ex. # 15, p. 63, l. 10-25; p. 64, l. 1-11, 23-25; p. 65, l. 1-25; p. 66, l. 1-6.

125.   Plaintiff took time from the break granted by Universal to him to take his medication to document every "incident" experienced with Rosado. This happened during

working hours, and using Universal's work equipment. Plaintiff recognizes this was purely a personal matter. See, D. Ex. # 15, p. 65, l. 10-25; p. 66, l. 1-19. Plaintiff does not remember when he started this practice. See, D. Ex. # 15, p. 25, l. 12-19.

126.   Plaintiff sent himself these emails to his wife's personal account as a reminder of every alleged unpleasant incident with Rosado and that were important to him. He would send these emails contemporaneously, at the time they occurred, to maintain a record of what happened with his supervisor. See, D. Ex. # 15, p. 24, l. 17-25; p. 25, l. 1-11.

127.   Examples of these "unpleasant" incidents were, for instance: 1- that Rosado once offered him flan during an office party; 2- that Rosado asked him how he felt in a tone he did not like; 3- that he would go to the bathroom and Rosado would follow him, but then she changed direction; 4- that Rosado once told him he had exceeded his break time, because he took eighteen (18) minutes; 5- that Rosado went to get him when he was in the lounge area drinking water. See, D. Ex. # 15, p. 68, l. 4-25; p. 69, l. 1-10; p. 77, l. 1-8; p. 91, l. 8-25; p. 92, l. 1-25; p. 99, l. 3-15.

128.   Plaintiff produced over two hundred (200) e-mails documenting these alleged "unpleasant" incidents with his supervisor. See, D. Ex. # 15, p. 69, l. 2-25; p. 70, l. 1-25; p. 71, l. 1-25; p. 72, l. 1-15.

129.   During his deposition, Plaintiff could not point to a single instance in which he could not take his medication because of Rosado. He did mention there were times when

he had to eat the crackers in a rush walking to his work area, and to drink the water and medication on the way to his desk. See, D. Ex. # 15, p. 96, l. 11-18; p. 98, l. 4-21.

130.   According to Plaintiff, he sent himself e-mails documenting whenever Rosado allegedly went to the lounge to get him to return to work before the fifteen (15) minutes had expired. Plaintiff never documented that Rosado did not let him take his break, or eat his snack or take his medication. See, D. Ex. # 15, p. 72, l. 19-25; p. 73, l. 1-17; p. 75, l. 11-25; p. 76, l. 1-23; p. 99, l. 15-18; p. 102, l. 2-18; p. 104, l. 1-14.

131.   Plaintiff testified that if Rosado had prevented him from taking his snack or medication, he would have documented it as well. See, D. Ex. # 15, p. 76, l. 12-23.

132.   Plaintiff alleges that there were times when Rosado did not allow him to take the break at all. However, according to Plaintiff this took place before 2009. See, D. Ex. # 15, p. 104, l. 15-23.

133.   According to Plaintiff, Rosado granted him permission many times to send these e-mails, although she was not aware of their nature. See, D. Ex. # 15, p. 66, l. 7-14.

134.   On February 3, 2010, Plaintiff met with Monge, from Human Resources, and Rosado. See, D. Ex. # 18, chain of emails between Plaintiff and Monge, dated February 3, 2010; D. Ex. # 5, p. 165, l. 14-24; p. 166, l. 1-21.

135.   According to Plaintiff, in that meeting the three (3) of them agreed that Rosado would be more lenient with the breaks; that the break would be ten (10) minutes long instead of twenty (20); and that Rosado would provide every other

accommodation that remained to be honored. See, D. Ex. # 5, p. 166, l. 20-24; p. 167, l. 1-17.

136. When asked what accommodations were not honored as of the time of the meeting, Plaintiff only remembered about the breaks: that Rosado would only grant him the morning break, but not the one in the afternoon. See, D. Ex. # 5, p. 167, l. 16-24; p. 168, l. 1-9.

137. Plaintiff testified that the times when Rosado did not let him take his breaks were prior to 2009. See, D. Ex. # 15, p. 104, l. 1-23.

138. On February 9, 2010, Monge sent an email to Plaintiff asking him to call her to see how things were going after the meeting. See, D. Ex. #18A, email from Monge to Plaintiff dated February 9, 2010; D. Ex. # 5, p. 169, l. 16-24; p. 170, l. 1-2.

139. Plaintiff alleged in his complaint that Universal discriminated against him because it did not provide him with reasonable accommodation and anchors his allegation on the following:

a. The SIF made some recommendations to Universal in October of 2007 (in an Ergonomic Report) because of his conditions (cervical and lumbar strain) and that Universal allegedly did not put them in place until 2009. See, D. Ex. # 5, p. 201, l. 5-24; p. 202, l. 1-24; p. 203, l. 1-24; p. 204, l. 1-24; p. 205, l. 3-9.

b. When he was at the Metro Office location in Guaynabo, the SIF had placed an artifact for his wrist to rest while he was typing, and that this modification was eliminated "immediately" when he was transferred to the Caguas location

because there was no space. See, D. Ex. # 5, p. 205, l. 12-24; p. 206, l. 1-10. At another point in his deposition, he stated that the tray for the keyboard, which placed the keyboard close to his lap, was never given to him in Metro Office or Caguas. He explained that the one in Metro Office was broken, and in Caguas it was eliminated due to space. See, D. Ex. # 5, p. 205, l. 12-19; p. 206, l. 7-10; p. 216, l. 4-21; p. 217, l. 1-17.

c.    Plaintiff also alleges that Universal did not let him perform the exercises recommended by the SIF, which he had to do twice a day for a minute or less. He testified that he was allowed to do it once, but not twice. See, D. Ex. # 5, p. 208, l. 18-24; p. 209, l. 1-24; p. 210, l. 1-19.

d.    Plaintiff also alleges that Universal did not grant him any of the positions he applied for. See, D. Ex. # 5, p. 212, l. 18-24; p. 213, l. 1-17.

e.    Plaintiff also alleges that Rosado did not let him park in the area reserved for clients although it was closer to the exit. She told him to park where all employees parked. Plaintiff did not address this request for a special parking to Human Resources. See, D. Ex. # 5, p. 231, l. 21-24; p. 232, l. 1-18.

f.    In 2010, Plaintiff complained to his supervisor that he wanted to earn more incentives and his supervisor told him he had to be certified in more departments (areas of expertise). See, D. Ex. # 5, p. 155, l. 5-11; p. 156, l. 4-14.

g.    Plaintiff admitted during his deposition that he used to receive incentives, but stated that at some point the incentive program changed and required that

representatives be certified in various areas of expertise. <u>See</u>, D. Ex. # 5, p.
156, l. 4-14.

h.    Plaintiff testified that since approximately June 30, 2010, he had taken the
courses in the area of collection and had passed the exam to be certified. <u>See</u>,
D. Ex. # 15, p. 123, l. 3-16.

i.    Plaintiff testified he took the exam to be certified sometime between August
and November 2010, and that he passed it. However, he was not granted the
certification license before he resigned on February 2, 2011. <u>See</u>, D. Ex. # 5,
p. 155, l. 4-24; p. 57, l. 1-8.

j.    Rosado told Plaintiff to contact the person in charge of granting the license.
Plaintiff did not do so because he thought that was his supervisor's job. <u>See</u>,
D. Ex. # 5, p. 156, l. 22-24 & p. 157, l. 1-4.

k.    According to Plaintiff every other co-worker was receiving incentives except
him. <u>See</u>, D. Ex. # 5, p. 155, l. 5-16; p. 157, l. 4-18.

140.    According to Plaintiff, while he worked for Universal he requested to be transferred
to several positions because of his "conditions" to obtain more "freedom" of
movement. <u>See</u>, D. Ex. # 1, p. 60, l. 10-23; p. 64, l. 6-24; D. Ex. # 15, p. 33, l. 20-25;
p. 34, l. 1-15.

141.    On October 22, 2009, Plaintiff sent an e-mail to Monge, from Human Resources. He
attached his resume and asked her to consider him for the position of Bank Service
Representative. His email was in reply to a job opening notified to all employees by

Monge, via email, on October 22, 2009. See, D. Ex. # 15, p. 37, l. 7-25; p. 38, l. 1-10; D. Ex. # 22, email from Plaintiff to Monge from Universal, dated October 22, 2009 re: Bank Service Representative position.

142. Plaintiff's e-mail on October 22, 2009 did not inform Monge that his request for the Bank Service Representative position was a request for reasonable accommodation because of his condition. See, D. Ex. # 15, p. 38, l. 22-25; D. Ex. # 22.

143. On November 1, 2009, Monge sent Plaintiff a letter informing him that Universal had selected another candidate whose skills and experience made him more suitable for the position of Bank Service Representative. See, D. Ex. # 15, p. 38, l. 11-15; D. Ex. # 23, letter dated November 11, 2009, from Monge to Plaintiff, re: Bank Service Representative Position.

144. On December 14, 2009, Plaintiff sent an email to Monge attaching his resume to be considered for the position of Cancellations Representative. The email was in reply to a job opening notified by Monge to all employees, on December 11, 2009. See, D. Ex. # 15, p. 39, l. 4-14; D. Ex. # 24, chain of Emails between Plaintiff and Monge re: Cancellations Representative.

145. Plaintiff's e-mail on December 14, 2009 did not inform Monge that his request for the Cancellations Representative was a request for reasonable accommodation because of his condition. See, D. Ex. # 15, p. 39, l. 18-24; D. Ex. # 24.

146. On January 21, 2010, Monge sent a letter to Plaintiff informing him that Universal had selected another candidate whose skills and experience made him more suitable

for the position.  <u>See</u>, D. Ex. # 15, p. 39, l. 25; p. 40, l. 1-6; D. Ex. # 25, letter dated January 21, 2010, from Monge to Plaintiff, re: Cancellations Representative-Liberty.

147. Sometime before April 2010, Plaintiff applied for the position of Junior Underwriter. <u>See</u>, D. Ex. # 15, p. 40, l. 7-12. Plaintiff wanted the position because he would have little or no supervision (i.e. "there was nobody on top of you"). Allegedly someone would tell the underwriter to create the policies, and "that's it". Also, it required the underwriter to "move around a lot, across all departments", go upstairs, or even traveling. <u>See</u>, D. Ex. # 15, p. 40, l. 18-25, p. 41, l. 1-5.

148. On April 20, 2010, Plaintiff was denied the position of Junior Underwriter. He received a letter from Monge informing him that Universal had selected another candidate whose skills and experience made him more suitable for the position. <u>See</u>, D. Ex. # 15, p. 41, l. 13-15; D. Ex. # 26, letter dated April 20, 2010 from Monge to Plaintiff re: Junior Underwriter position.

149. On September 3, 2010, Plaintiff sent an email to Monge requesting to be considered for the After Hours 24/7 program. <u>See</u>, D. Ex. # 15, p. 41, l. 16-21. The program provided additional compensation to representatives that were available to provide service from their homes on weekends and/or Holidays. <u>See</u>, D. Ex. # 27, chain of emails between Plaintiff and Monge re: After Hours 24/7, from September 1-3, 2010; D. Ex. # 15, p. 44, l. 10-17.

150. To be eligible for the Program, the candidate had to meet several requirements. Among them: 1) be proficient on 4 or 5 areas (Retention, CAICO, Claims

Agency/Collections); 2) low percentage of absenteeism; 3) no disciplinary record in the past twelve (12) months; 4) ability to work with minimum supervision; 5) ability to work under pressure; and 6) be bilingual (ability to maintain a conversation with client). See, D. Ex. # 27.

151.    Among others, Plaintiff did not have a certification in the five (5) areas for which the After Hours Program required proficiency. See, D. Ex. # 15, p. 43, l. 8-13. As of December 31, 2009, Plaintiff was only certified in two (2) areas (Claims and CAICO). See, D. Ex. # 15, p. 119, l. 23-25; p. 120, l. 1-5; D. Ex. # 32, p. 3.

152.    Plaintiff is not bilingual. See, D. Ex. # 15, p. 43, l. 14-20. Plaintiff is not able to maintain a conversation with a client if it is outside of the comfort zone of what he usually said at work. See, D. Ex. # 15, p. 44, l. 3-9.

153.    Plaintiff's email to Human Resources requesting to be considered for the After Hours Program did not specify it was a request for reasonable accommodation. See, D. Ex. # 15, p. 47, l. 23-25; p. 48, l. 1-3.

154.    At some point, Plaintiff had informed his supervisor that he could not work on weekends because of his moonlighting as a realtor. See, D. Ex. # 15, p. 44, l. 18-22.

155.    On August 18, 2010, Plaintiff sent himself an email to his wife's personal email account as a note to self. He stated: "the issue of working on Saturdays is questioned, when they know that I have my business and I have to work it, Mrs. Rosado." See, D. Ex. # 15, p. 45, l. 1-10.

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 48

156.    Plaintiff recognizes that he was very careful when he documented incidents that happened to him. Also, if anything happened to him, he would inform Human Resources and document it very well. Also, he testified that he was very careful when he made requests for reasonable accommodation. <u>See</u>, D. Ex. # 15, p. 48, l. 8-20.

157.    On November 12, 2010, Mrs. Mayleen Sánchez ("Sánchez") from Human Resources at Universal, notified a job opening to all employees. The position was Coverage Verifier. <u>See</u>, D. Ex. # 15, p. 48, l. 21-25; p. 49, l. 1-9; D. Ex. # 28, chain of emails between Mrs. Maribel Pérez ("Pérez") and Plaintiff, re: position of Coverage Verifier.

158.    On November 15, 2010, Plaintiff sent an email to Pérez with the subject: "Attached is my email for said position", referring to the Coverage Verifier. <u>See</u>, D. Ex. # 15, p. 49, l. 19-25; p. 50, l. 6-12.

159.    Plaintiff did not specify in the email that the application for the Coverage Verifier position was a request for reasonable accommodation. <u>See</u>, D. Ex. # 15, p. 50, l. 10-15; D. Ex. # 28, chain of emails between Pérez and Plaintiff, re: position of Coverage Verifier.

160.    Also, Plaintiff's email did not explain why he was requesting the Coverage Verifier position and how the transfer to said position would accommodate his condition. <u>See</u>, D. Ex. # 15, p. 54, l. 8-12; D. Ex. # 28.

161.    Two (2) days later, Pérez wrote to Plaintiff telling him that the attachment did not open. <u>See</u>, D. Ex. # 15, p. 50, l. 16-22, D. Ex. # 28, p. 1.

162.  Plaintiff did not send the resume again because he assumed Pérez had it from the other times he applied. He has no evidence that he ever re-sent his resume to Pérez. See, D. Ex. # 15, p. 51, l. 2-20.

163.  On December 29, 2010, Sánchez notified a job opening as a Retention Representative to all employees, which Plaintiff forwarded to his wife's personal email account. See, D. Ex. # 15, p. 55, l. 9-13, p. 56, l. 1-17; D. Ex. # 29, chain of emails re: Retention Representative.

164.  On January 4, 2011, Plaintiff sent an email to Sánchez forwarding her previous e-mail with the publication of the job opening. In his e-mail to Sánchez, Plaintiff included no text nor did he indicate that he was interested in the position. Plaintiff testified in his deposition that he understood it was obvious and there was no need to explain. See, D. Ex. # 15, p. 55, l. 9-25; p. 56, l. 1-25; p. 57, l. 1-9; D. Ex. # 29, p. 3.

165.  That same day, Sánchez sent Plaintiff an email informing him that the attachment did not open. See, D. Ex. # 15, p. 56, l. 18-22; D. Ex. # 29, p. 2-3.

166.  There is no evidence that Plaintiff ever re-sent his resume to Sánchez. Plaintiff explained that Universal was supposed to have his resume from earlier applications. See, D. Ex. # 15, p. 56, l. 23-25; p. 57, l. 1-2.

167.  On January 2, 2011, Sánchez published a job opening for the position of Collection Clerk. See, D. Ex. # 15, p. 58, l. 9-19; D. Ex. # 30, chain of emails between Plaintiff and Sánchez re: Collection Clerk position, p. 1-2.

168.   On January 11, 2011, Plaintiff sent an email to Sánchez in reply to the Collection Clerk opening, with the subject "Attached is my resume". Plaintiff did not include any other text. Also, he did not specify that he requested the position as a reasonable accommodation. See, D. Ex. # 15, p. 58, l. 16-25; p. 59, l. 1-3; p. 59, l. 25; p. 60, l. 1-12; D. Ex. # 30, p. 1.

169.   The position of Collection Clerk had various requirements. Among them, the position required one (1) year of experience in the area of Collections, or combination of education and experience. See, D. Ex. 15, p. 60, l. 13-18. Plaintiff was first trained in the area of collections in June of 2010. See, D. Ex. # 15, p. 60, l. 25; p. 61, l. 1-8.

170.   As of January 2011, when Plaintiff applied for the position of Collection Clerk, Plaintiff did not have one (1) year of experience or education in the area Collections. Also, he does not remember if he had any education in said area from college by the time he applied for the position. See, D. Ex. # 15, p. 61, l. 4-25; p. 62, l. 1-2.

171.   Plaintiff does not have any other evidence or memory of other positions he applied for in the last three (3) years of employment with Universal. See, D. Ex. # 15, p. 62, l. 10-23.

172.   Plaintiff does remember that he applied for the position of Internal Appraiser, but in any event this was prior to year 2010. See, D. Ex. # 15, p. 62, l. 21-25; p. 63, l. 1-4.

173.   In December of 2010, Plaintiff was suspended from work by Melina, after being so instructed by the Human Resources Department, for improper use of technological

resources. According to the document, Plaintiff had used the internet for personal use while he placed a call from a client on hold. See, D. Ex. # 5, p. 180, l. 9-19; p. 181, l. 16-24; p. 182, l. 1-24; p. 183, l. 1-20; D. Ex. # 15, p. 162, l. 15-25; p. 163, l. 1-11; D. Ex. # 31 Suspension "Use of Technological Resources", dated December 27, 2010.

174.  According to Plaintiff, he presented some evidence that showed he did not engage in that conduct. Universal reversed the suspension, paid him his salary for the period he remained suspended, and apologized for the mistake. See, D. Ex. # 15, p. 163, l. 14-20.

175.  In January of 2011, Melina told Plaintiff that he would withhold the breaks until he presented evidence from the SIF that supported said accommodation. See, D. Ex. # 5, p. 185, l. 24; p. 186, l. 1-17.

176.  The day before his resignation, Plaintiff met with Berrios and Mrs. Carmen Figueroa from Human Resources to discuss his suspension. Berrios allegedly told Plaintiff he was always a problem with his condition and his issues. She also allegedly told him there were other employees working at Universal that were enjoying the benefits of Worker's Compensation and had a forty percent (40%) disability. See, D. Ex. # 5, p. 186, l. 21-24; p. 187, l. 1-24; p. 188, l. 1-14; p. 190, l. 14-24; p. 191, l. 1-20.

177.  That day, Plaintiff allegedly gave all the evidence he had regarding the SIF to Human Resources. See, D. Ex. # 5, p. 186, l. 21-24; p. 187, l. 1-24; p. 188, l. 1-14.

178.  Plaintiff resigned from his job on February 2, 2011 because of the alleged pressure and discrimination he suffered at work. See, D. Ex. # 5, p. 6, l. 17-18; p. 188, l. 9-24; p. 189, l. 1-5.

179.  As per Plaintiff's sworn deposition testimony, the purported discrimination that moved Plaintiff to resign was: 1) that Berríos and Rosado doubted him and questioned his conditions, asking him to produce evidence of the conditions and the accommodations requested; and 2) that Universal did not allow him to move to a different position. He felt forced to resign with their actions (all the acts of discrimination and/or harassment he discussed in his deposition). See, D. Ex. # 5, p. 188, l. 9-24; p. 189, l. 1-24; p. 190, l. 1-24.

180.  Plaintiff also alleges in his Complaint that he was retaliated against because he requested the benefits of Workmen's Compensation. According to him, that was his protected activity that prompted the retaliation. See, D. Ex. # 5, p. 233, l. 3-24; p. 234, l. 1-9.

181.  During Plaintiff's deposition, he alleged that he mentioned to Human Resources that he could not believe that Rosado's treatment or attitude towards him was because of his SIF's activity. Further, he does not remember if he put this in writing. See, D. Ex. # 5, p. 235, l. 19-22; p. 236, l. 1-11.

182.  Plaintiff's allegations of retaliation are essentially the same allegations supporting his allegations of harassment (i.e. that Rosado followed him to the bathroom; that

she scolded him too much; and that she refused to grant him a day off to get married). See, D. Ex. # 5, p. 234, l. 1-24; p. 235, l. 1-24.

183.  Since approximately 2004, Universal implemented an Incentive Program to provide additional compensation to representatives commensurate with their production and the quality of their work. The representatives' incentive would take into account several aspects of their performance, including: quality of their work as measured by the periodic monitoring of calls; productivity; and attendance. See, D. Ex. # 34, ¶ 3; D. Ex. # 34A, Procedure for the management of incentives to be granted to the Customer Care Department's claims group, bates nos. 1313-1318.

184.  Said plan was in effect while Rosado was Plaintiff's supervisor. See, D. Ex. # 34, ¶¶ 3-4.

185.  Universal made payments to Plaintiff for incentives in every year since 2006 through 2010, although not necessarily every month. See, D. Ex. # 15, p. 125, l. 10-25; p. 126, l. 1-25; p. 127, l. 1-25; p. 128, l. 1-2; D. Ex. # 34, ¶ 5.

186.  During that time, there were months when other employees were not awarded incentives, while Plaintiff was awarded incentives. Also, there were times when Plaintiff was awarded higher incentives than his peers. See, D. Ex. # 15, p. 129, l. 1-24, p. 137, l. 3-24; D. Ex. # 34, ¶ 5. For instance:

a.   In January of 2008, Plaintiff was awarded $150.00 in incentives. Seven (7) other representatives obtained the same amount, while other six (6)

representatives did not obtain any. <u>See</u>, D. Ex. # 34, ¶ 5a; D. Ex. # 34B, bates no. 888.

b.      In February of 2008, Plaintiff was awarded $150.00 in incentives. One (1) other representative obtained less than him ($112.50); three (3) other representatives obtained the same amount as him ($150.00); and six (6) other representatives did not obtain any. <u>See</u>, D. Ex. # 34, ¶ 5b; D. Ex. # 34B, bates no. 889.

c.      In March of 2008, Plaintiff was awarded $150.00 in incentives. Five (5) other representatives were awarded the same amount as him; and seven (7) others did not receive any. See, D. Ex. # 34, ¶ 5c; D. Ex. # 34B, bates no. 890.

d.      In April of 2008, Plaintiff was awarded $150.00 in incentives. Seven (7) other were awarded the same amount; and six (6) other representatives were not awarded any. <u>See</u>, D. Ex. # 34, ¶ 5d; D. Ex. # 34B, bates no. 891.

e.      In May of 2008, Plaintiff was awarded $150.00 in incentives. Five (5) other representatives were awarded the same amount; and three (3) others were not awarded any. <u>See</u>, D. Ex. # 34, ¶ 5e; D. Ex. # 34B, bates no. 892.

f.      In September of 2008, Plaintiff was awarded $200.00 in incentives. Two (2) other representatives obtained a lower incentive ($150.00); and five (5) others did not receive any. <u>See</u>, D. Ex. # 34, ¶ 5f; D. Ex. # 34B, bates no. 896.

g.    In October of 2008, Plaintiff was awarded $200.00 in incentives. Three (3) others received lower incentives; and two (2) others did not receive any. See, D. Ex. # 34, ¶ 5g; D. Ex. # 34B, bates no. 897.

h.    In September of 2010, Plaintiff was awarded $150.00 in incentives. Six other employees received the same amount, and one employee received less than Plaintiff: $112.50. See, D. Ex. # 34, ¶ 5h; D. Ex. # 34B, bates no. 879.

i.    In October of 2009, Plaintiff was awarded $112.50 in incentives, while two (2) others were awarded lower incentives ($50); and four (4) representatives did not receive any. See, D. Ex. # 34, ¶ 5i; D. Ex. # 34B, bates no.  885.

j.    In December of 2009, Plaintiff was awarded $112.50 in incentives. Another representative obtained the same amount; and three (3) others did not receive any. See, D. Ex. # 34, ¶ 5j; D. Ex. # 34B, bates no. 887.

187.   Also, many of the times when Plaintiff was not awarded incentives, there were other employees who also did not receive incentives. See, D. Ex. # 15, p. 140, l. 5-25; p. 141, l. 1-4; p. 142, l. 1-12; D. Ex. # 34B, bates no. 872-878. For example:

a.    In June of 2008, Plaintiff was not awarded incentives, same as four (4) representatives. See, D. Ex. # 34, ¶ 6a; D. Ex. # 34B, bates no. 893.

b.    In July of 2008, Plaintiff was not awarded incentives, same as seven (7) representatives. See, D. Ex. # 34, ¶ 6b; D. Ex. # 34B, bates no. 894.

c.    In April of 2009, Plaintiff was not awarded incentives, same as three (3) representatives. See, D. Ex. # 34, ¶ 6c; D. Ex. # 34B, bates no. 880.

d.      In May of 2009, Plaintiff was not awarded incentives, same as four (4) representatives. See, D. Ex. # 34, ¶ 6d; D. Ex. # 34B, bates no. 881.

e.      In August of 2009, Plaintiff was not awarded incentives, same as seven (7) representatives. See, Ex. # 34, ¶ 6e; D. Ex. # 34B, bates no. 882.

f.      In September of 2009, Plaintiff was not awarded incentives, same as six (6) representatives. See, D. Ex. # 34, ¶ 6f; D. Ex. # 34B, bates no. 883.

g.      In November of 2009, Plaintiff was not awarded incentives, same as three (3) representatives. See, D. Ex. # 34, ¶ 6g; D. Ex. # 34B, bates no. 886.

h.      In January of 2010, Plaintiff was not awarded incentives, same as seven (7) representatives. See, D. Ex. # 34, ¶ 6h; D Ex. # 34B, bates no. 872.

i.      In February of 2010, Plaintiff was not awarded incentives, same as six (6) representatives. See, D. Ex. # 34, ¶ 6i; D. Ex. # 34B, bates no. 873.

j.      For the trimester of March through June of 2010, Plaintiff was not awarded incentives, same as two (2) representatives. See, D. Ex. # 34, ¶ 6j; D. Ex. # 34B, bates no. 874.

k.      In June of 2010, Plaintiff was not awarded incentives, same as three (3) representatives. See, D. Ex. # 34, ¶ 6k; D. Ex. # 34B, bates no. 876.

l.      In July of 2010, Plaintiff was not awarded incentives, same as six (6) representatives. See, D. Ex. # 34, ¶ 6l; D. Ex. # 34B, bates no. 877.

188.   In September of 2010, Plaintiff received $150.00 in incentives. Six other employees received the same amount, and one employee received less than Plaintiff: $112.50. See, D. Ex. # 34, ¶ 6m; D. Ex. # 15, p. 142, D. Ex. # 34B, bates no. 879.

189.   In August of 2010, Plaintiff was the only representative that was not awarded incentives. However, that month he obtained the lowest percentage of monitoring (83%), compared to the next lowest (91%). See, D. Ex. # 34, ¶ 7; D. Ex. # 34B, bates no. 878.

190.   Plaintiff filed his administrative charge of discrimination before the Puerto Rico Department of Labor, Anti-Discrimination Unit on April 6, 2011. See, D. Ex. # 19, Administrative Charge before the ADU, dated April 6, 2011; D. Ex. # 5, p. 200, l. 1-24; p. 201, l. 1-3.

## LEGAL DISCUSSION

### A.   FAILURE TO ACCOMMODATE CLAIMS UNDER THE ADA.

Regarding the ADA failure to accommodate claims, it has long been held that prior to resorting to the courts for relief, plaintiffs must present their discrimination claims under Title VII to the appropriate agency. Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005); Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005); Lebrón-Rios v. U.S. Marshal Service, 341 F.3d 7, 13 (1st Cir. 2003); Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003); Clockedile v. New Hampshire Dept. of Corrections, 245 F.3d 1, 3 (1st Cir. 2001).  A cause of action under the ADA must be based on an administrative discrimination charge filed before the Equal Employment Opportunity Commission ("EEOC") within 180 days of the

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 58

alleged wrongful act; or, if a non-federal fair employment practices ("FEP") agency is authorized to investigate the charge, the charge must be filed with the EEOC or the FEP agency within 300 days of the alleged wrongful act. 42 U.S.C. § 12117(a).  The Puerto Rico FEP agency authorized to investigate and evaluate claims of discrimination based on disability is the Anti-Discrimination Unit of the Department of Labor and Human Resources ("ADU").  See 29 C.F.R. §§ 1601.13, 1601.14 and 1601.74.  Consequently, in Puerto Rico, a charge of discrimination must be filed with the EEOC or the ADU within 300 days of the alleged discrimination in order to be timely.

In the case at bar, it is undisputed that Plaintiff filed his charge of discrimination with the Puerto Rico Department of Labor's Anti-Discrimination Unit on April 6, 2011.  See, Uncontested Material Fact ("UCMF") No. 190.  Therefore, the actionable acts must have occurred within 300 days from that date, or after June 10, 2010.  *See also* Nat'l R.R. Passenger Corp v. Morgan, 536 U.S. 101, 114,122 S.Ct. 2061, (2002)(Only acts that occurred within 300 days before the date of the filing of the change with the appropriate state agency are actionable).

During Plaintiff's deposition, however, he clearly stated under oath that his failure to accommodate claims stemmed from the SIF's Ergonomic Report, dated October 18, 2007.  See, UCMF No. 49.  Plaintiff further admitted that by late 2009, all of the SIF's recommendations had been complied with (albeit tardily) and that he complied with the exercise routine recommended by the SIF.  See, UCMF Nos. 86, 87, 93, 94, 95 and 96.

Since the claim with the Puerto Rico Department of Labor was filed in April 2011, these claims fall outside that time frame.

In support of the contention there were other requests for accommodation made within the 300 day time period, Plaintiff refers to several instances where he requested transfers to other positions within the company; yet these are vague, unsubstantiated and even worse, they do not specifically state (or even suggest) that they are requests for accommodation.  For instance, Plaintiff avers that he sent his resume to Human Resources on several occasions for internal position openings, yet concedes that at no time did he state that they were requests for reasonable accommodation.  See, UCMF Nos. 141, 142, 144, 145, 147, 149, 153, 157, 158, 159, 163, 164, 167, and 168.  Other requests, such as a change of parking space, were also not requested as reasonable accommodation.  See, UCMF No. 139e.  Without any further information provided or request having been made to Defendants, Plaintiff posits that Universal had to somehow "know" that his applications for other positions within the company were requests for accommodation because he was allegedly under treatment at the SIF.  The Court cannot take this leap, and assume that Universal somehow discerned that, without further explanation, a request by Plaintiff to be considered for an internal job opening could possibly be understood to be a request for accommodation. Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 23 (1st Cir. 2004) ("The request for accommodation must be sufficiently direct and specific, giving notice that she needs a special accommodation." (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir.2001)).  See, Reed, 244 F.3d at 260  ("We need not concern ourselves with the

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 60

reasonableness of [plaintiff's] accommodation, however, because [she] has failed to prove

another essential element of her burden: that she ever sufficiently requested the

accommodation in question. This is the fatal flaw in [plaintiff]s case.   The employer has

no duty to divine the need for a special accommodation where the employee merely makes

a mundane request for a change at the workplace."); Kiman v. New Hampshire Dept. of

Corrections, 451 F.3d 274, 283 (1st Cir. 2006) (actual request needed to trigger a reasonable

accommodation duty).

        In addition, Plaintiff's transfer requests in the case at bar never clearly indicated that

they were requests for accommodation.  The fact that Plaintiff was receiving treatment at

the SIF while continuing to work, instead of rest, clearly evidences that Plaintiff could work,

and cannot be construed to mean that Universal should interpret a petition to transfer as

a reasonable accommodation, particularly when Plaintiff failed to so articulate.  See UCMF

Nos. 61, 71.  At most, without more than what is contained in the record, what can be

inferred, if anything,  from Plaintiff's interest in these internal positions is precisely that –

interest in other areas of the company.   Therefore, having presented no evidence of any

request for accommodation made within the applicable time frame, the Court finds that the

Plaintiff's ADA request for accommodation cause of action is time-barred.

**B.      RETALIATION CLAIMS UNDER THE ADA.**

        Regarding the retaliation claims, the Court agrees with Defendants that Plaintiff

failed to exhaust administrative remedies.  Even if he had exhausted remedies, however, the

claims would still be time-barred.

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 61

As previously noted, exhaustion of administrative remedies is an integral component of the Title VII legislative scheme.  In Puerto Rico, an aggrieved employee has 300 days from the occurrence of the employment action complained of to file an administrative charge in instances where the local Department of Labor is empowered to provide relief; that is, in instances of "deferral" jurisdiction.  See, Bonilla v. Muebles J.J. Alvarez, 194 F.3d 275, 278, n. 4 (D. Puerto Rico 1999).  The designation of Puerto Rico as a "deferral" state for Title VII violations, however,  specifically excludes retaliation claims. See, 29 C.F.R. § 1601.74. Therefore, claims for retaliation must be filed with the EEOC within 180 days from the events complained of.  See, Alvarez v. Delta Airlines, Inc., 319 F.Supp.2d 240, 249 (D. Puerto Rico 2004) ("The EEOC has not conferred the ADU in Puerto Rico with jurisdiction to hear claims for retaliation under section 704(a) of Title VII, 42 U.S.C. § 2000e−3(a), such as the one presented by [plaintiff], which is an independent cause of action from his sexual harassment claims. See 29 C.F.R. § 1601.74. In such a case, a claimant will have 180 days, not 300 days, from the alleged unlawful employment practice to file a charge of retaliation under Title VII with the EEOC.")

Plaintiff posits that the Court of Appeals for the First Circuit has held that the exhaustion requirement may prove inadequate in some instances and may be waived "so long as the retaliation is reasonably related to and grows out of the discrimination complained of to the agency— e.g., the retaliation is for filing the agency complaint itself.", citing Clockedile, 245 F.3d at 6.  While that is correct, it is inapplicable to the facts of the present case, as the alleged retaliatory events allegedly arose, not from Plaintiff having filed

Ramon  Rivera Vélez, et al v.  Universal Insurance Company, et al
Civil No. 11-2260  (CVR)
Opinion and Order
Page 62

his initial discriminatory claim on April 6, 2011, *but rather, in Plaintiff's own words, from his request for benefits from the State Insurance Fund*.  See, UCMF No. 180. Clockedile is therefore inapposite to this case.

Plaintiff now conveniently argues that the protected activity that gave rise to the retaliatory conduct were the requests for accommodation, and in fact, grounded his opposition on this argument.  See Plaintiff's Opposition at pp. 5 and 8.  Yet, this fact is largely unsupported by the deposition testimony and the uncontested facts. On the contrary, Plaintiff explicitly stated in his deposition that the protected activity he undertook that generated the retaliation was the opening of the case with the SIF.

Q In what protected activities do you believe you participated?
A The Fund, the Fund.
Q Having reported to the Fund and filing cases with the Fund?
A That upset them.
Q The Fund. In what other protected activities do you understand that you...?
A No, the Fund, because what I did was  go to the Fund all the time.
Q So, then, when we are talking about  your claim of retaliation, your understanding is that your protected activity was going to the State Insurance Fund?
A Going to the State Insurance Fund, claiming... um... my situation and, well, they don't......they definitely didn't like that.  P. Exhibit 5 at p. 233, l. 9-24, p. 334, l. 1.

It is undisputed that Plaintiff's first case was opened with the SIF in May of 2007. See, UCMF Nos. 46 and 50.  Yet, it was not until *April 2011, almost 4 years later*, when Plaintiff finally filed his claim before the Puerto Rico Anti-Discrimination Unit.  The claims are therefore time-barred.

Even if the Court were to consider that the requests for accommodation were not time-barred and were in fact, protected activity immune to the alleged retaliatory measures taken by Defendants, as previously discussed, the record is devoid of evidence of any such requests having been made by Plaintiff within the applicable time period.   First, it is undisputed that by late 2009, the SIF's suggestions and corrective measures had all been implemented.    Therefore, besides the fact that they fall outside of the applicable time frame, they were complied with.  Second, and as previously discussed, Plaintiff's argument that Universal "knew" that his requests for transfers to other departments were somehow requests for accommodation is unavailing, insofar as he admitted under oath that he did not specifically state so in any of the petitions he made for the available internal positions. Finally, it is worthy of noting that Plaintiff was not even qualified for some of the positions he applied to.  See, UCMF Nos. 151, 152, and 154.  For the aforementioned reasons, the Court concludes that the retaliation claims are also time-barred.

Insofar as Plaintiff's federal claims are time-barred, the Court does not need to reach the actual merits of the claims.

## C.    Supplemental Jurisdiction.

Having herein disposed of the federal claims, pendent state claims jurisdiction is based upon the federal ADA claims.  When the fundamental federal questions claims are dismissed, a district court may reassess its jurisdiction over the supplemental claim, which

ordinarily weigh strongly in favor of declining jurisdiction.  *See* Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996); *see also* Camelio v. American Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).

Thus, regarding the supplemental state claims, the Court refuses to exercise its supplemental jurisdiction pursuant to 28 U.S.C.  §1367, and dismisses them, without prejudice, so the Plaintiff might re-file them in the Commonwealth court if he so wishes.

## CONCLUSION

In view of the above, Defendants' Motion for Summary Judgment is GRANTED. (Docket No. 39). Accordingly, all the ADA federal claims brought under 42 U.S.C. §§ 21201, *et seq.,* are DISMISSED WITH PREJUDICE and the state-based claims are DISMISSED WITHOUT PREJUDICE.

Judgment is to be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 14th day of May of 2014.

s/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE